**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:
**DIANE SHIELDS**
Mishawaka, Indiana

ATTORNEYS FOR APPELLEES:
**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINA D. PACE**
Deputy Attorneys General
Indianapolis, Indiana

FILED
Jun 12 2014, 10:45 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE
TERMINATION OF THE PARENT-
CHILD RELATIONSHIP OF

B.P.V. & B.L.V. (MINOR CHILDREN)
AND
H.P. (MOTHER),

    Appellant-Respondent,

        vs.

THE INDIANA DEPARTMENT OF
CHILD SERVICES,

    Appellee- Petitioner.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 71A04-1310-JT-546

APPEAL FROM THE ST. JOSEPH PROBATE COURT
The Honorable James N. Fox, Judge
Cause No. 71J01-1204-JT-026
71J01-1204-JT-027

**June 12, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

H.P. (Mother) appeals the involuntary termination of her parental rights to B.P.V. and B.L.V. (collectively, the Children). Mother challenges the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.

Mother has three children: M.S., B.P.V., born July 6, 2000, and B.L.V., born March 30, 2004.[1] On January 3, 2011, M.S. called the police after Mother hid all three of their backpacks and shoes, refused to let them go to school, and began accusing B.P.V. and B.L.V. of raping her. The St. Joseph County Sheriff's Department notified the Department of Child Services (DCS) that Mother was under the influence of drugs or alcohol, that she was going to be arrested, and that the Children had no place to go.[2] DCS removed the Children from the home and placed them in the care of their maternal grandparents at Mother's request. It was determined that Mother was suffering a psychotic episode.

Todd Hough, a family case manager with DCS, (FCM Hough) initiated an investigation. FCM Hough observed that the home was "messy and in disarray." *Appellant's Appendix* at 74. FCM Hough then spoke with children, who disclosed that Mother "'gets drunk[]', lays down and cannot get up, and stumbles against the walls." *Id.* FCM Hough also spoke with Mother, who stated that she had "'gone crazy'" and had locked B.P.V. in his room because she was not ready for him to go to school. *Id.* Mother

---

[1] M.S. is not involved in these proceedings.

[2] The Children's biological father refused to leave work to tend to the Children.

also disclosed to FCM Hough that she takes anti-psychotic and anti-depressant medications.

Following a detention hearing, the Children were declared CHINS on January 5, 2011. In the court's February 7, 2011 CHINS dispositional order, Mother was ordered to participate in individual and family counseling, regularly participate in supervised visitation with the Children, complete a parenting evaluation, obtain and maintain a legal and regular source of income, obtain and maintain adequate housing, maintain consistent contact with DCS, complete a substance-abuse evaluation, and complete a psychiatric evaluation. After a subsequent review hearing on August 8, 2011, the court further ordered Mother to successfully complete the Aftercare program, submit to random drug screens, successfully complete parenting classes, work with a parent aid once the Children are placed back in the home, take medications as prescribed, and pay child support as ordered by the court.

Kathleen Orr, an assessment family case manager with DCS, (FCM Orr) was initially assigned to Mother to assist her in obtaining the necessary services directed at reuniting Mother with the Children. FCM Orr worked with Mother over the course of sixteen months. At the termination hearing, FCM Orr testified that Mother participated in all of the services DCS required of her. Specifically, Mother complied with supervised visitation, participated in individual and family therapy, communicated with FCM Orr, completed the required assessments and parenting classes, and submitted to random drug screens, all of which came back "clean." *Transcript* at 16. FCM Orr also noted that Mother had stopped consuming alcohol and that she believed Mother was taking her

medications as prescribed. FCM Orr noted improvement in the well-being of Mother and the Children such that in November 2011, she recommended a trial home visit.

Prior to the trial home visit, however, M.S. disclosed to the juvenile judge in chambers that Mother's boyfriend, who is also the Children's biological father, had sexually abused her. On November 28, 2011, the juvenile court entered an order denying the trial home visit and temporarily suspending further visitation. Supervised visitation between the Children and Mother resumed at some point. Thereafter, FCM Orr noticed some regression in some of Mother's behaviors in that she would not follow basic rules of supervised visitation or the recommendations of her therapist. Specifically, Monica Rohm, a parent educator who oversees supervised visitations, testified that Mother was very impulsive with her thoughts, would blurt things out that she was thinking, was very emotional and cried more than was usual in such situations, and would let the Children "run over her" without any consequences. *Id*. at 72. Further, even after the substantiated sexual abuse allegations by M.S. about the Children's father, Mother maintained her relationship with him and the two continued to live together.[3] Because of Mother's continued behavior problems, the juvenile court again suspended all supervised visits between Mother and the Children. Visitation with the Children has not been reinstated because it has not been supported by Mother's therapists.

DCS also worked with Mother to help her find employment and obtain stable housing. Although Mother was actively searching for employment, she had yet to secure a job. With regard to housing, Mother lived in a two-bedroom apartment. Without any

[3] Mother allegedly ended her relationship with the Children's father in June 2012.

4

source of income, employment, or social security, Mother relied upon the Children's father to help her pay her bills. Mother also would permit relatives to stay with her. There remained concern amongst DCS employees assigned to work with Mother that Mother could not provide for her own basic needs.

As part of the services offered to Mother, Dr. Jeff Burnett, a psychologist, conducted a psychological parenting evaluation of Mother. Dr. Burnett noted that Mother's psychological state had improved in that at the time of his evaluation she was not psychotic and she seemed less depressed. Dr. Burnett, however, diagnosed Mother with a panic disorder with agoraphobia. Dr. Burnett explained his diagnosis as "an intense form of anxiety where a nervous system kind of goes on overdrive." *Id.* at 38. He described Mother's condition as a "vicious cycle" in which a person begins to experience anxiety about having a panic attack. *Id.* He further explained that agoraphobia occurs when an individual begins to fear going out because it will lead to another panic attack, which in turn leads to the individual becoming more reclusive and isolated. Dr. Burnett testified that Mother's condition could be "mostly controlled" with medication. *Id.* at 49. Mother, however, could not remember to regularly take her medication and admittedly took more than prescribed without authorization.

Dr. Burnett also administered a Child Abuse Prevention Inventory on Mother. Mother's responses, however, indicated defensiveness and memorization such that the test was invalidated and the inventory itself was uninterpretable. Dr. Burnett believed that in her responses Mother was exaggerating her positive characteristics and minimizing her negative characteristics. After his evaluation of Mother, Dr. Burnett

5

expressed concern about Mother's ability to be a parent to the Children. Specifically, Dr. Burnett was concerned that Mother did not have age-appropriate expectations for the Children and that her mental state did not enable her to be flexible and accommodating to their various stages of development.

Meladie Langham, a therapist, was also assigned to work with Mother on issues of domestic violence, depression, anxiety, and dependency. Ms. Langham testified that in the time she worked with Mother that Mother had made "very little to no progress" toward the goals established for her in addressing the identified issues. *Id*. at 55. Ms. Langham described several incidents where Mother became extremely emotional nearly to the point of being unable to perform basic tasks and other incidents where Mother experienced extreme emotions to the same stimulus. She also expressed concern about Mother's ability to care for herself financially, specifically noting that Mother heavily relied upon others.

On April 10, 2012, DCS filed verified petitions for the involuntary termination of Mother's parental rights to the Children and the permanency plan was changed from reunification with Mother to adoption of the Children by their current foster parents.[4] On August 1, 2013, the juvenile court held a hearing on the petitions to terminate Mother's

---

[4] As noted above, the Children were initially placed with their maternal grandparents. On May 3, 2012, the Children were removed from their maternal grandparents' home and placed in foster care. After a short stay in one foster home, the Children were moved to a second foster home, which is where they currently reside.

parental rights to the Children. On October 2, 2013, the juvenile court entered its order terminating Mother's parental rights to the Children.[5] Mother now appeals.

Here, the juvenile court made detailed findings in its order terminating Mother's parental rights to the Children. Where the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen,* 671 N.E.2d 98.

We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the parents to those of the child when evaluating

---

[5] The Children's biological father voluntarily relinquished his parental rights.

the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code Ann. § 31-35-2-4(b)(2)(B) (West, Westlaw current through P.L.29 of the 2nd Reg. Sess. of the 118th General Assembly (2014) with effective dates through March 13, 2014). The State is also required to prove that termination of parental rights is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw current through P.L.29 of the 2nd Reg. Sess. of the 118th General Assembly (2014) with effective dates through March 13, 2014)). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw current through P.L.29 of the 2nd Reg. Sess. of the 118th General Assembly (2014) with effective dates through March 13, 2014).

In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. *In re J.C.,* 994 N.E.2d 2778 (Ind. Ct. App. 2013). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied.* "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.,* 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

Further, it is well settled that mental disability, standing alone, is not a proper ground for terminating parental rights. *R.G. v. Marion County Office of Family and Children,* 647 N.E.2d 326 (Ind. Ct. App. 1995), *trans. denied.* Mental disabilities, however, may be considered in instances where parents are incapable of or unwilling to fulfill their legal obligations in caring for their child. *Id.*

In support of its order terminating Mother's parental rights, the juvenile court made the following findings:

> [Mother] was unable to complete the Orders of the Disposition Order independently. [Mother] loves her children. [Mother] has been unable to obtain either stable housing or gainful employment. [Mother] still relies on [the Children's biological father] for support. [Mother] gave confused answers to basic questions. . . . [Mother] was in jeopardy of losing her residence due to her lack of income and failure to pay her rent. . . . [Mother's] lack of coping skills, independence, income, coupled with her

9

highly emotional personality, history of substance abuse and psychological problems make termination of her parental rights in best interest of the [C]hildren.

*Appellant's Appendix* at 49. The juvenile court concluded that the State had proven by clear and convincing evidence that there is a reasonable probability that the conditions resulting in the removal of the Children from their home would not be remedied and that there is a reasonable probability that the continuation of the parent-child relationship will pose a threat to the well-being of the Children. The court also determined that termination of Mother's parental rights was in the best interests of the Children.

We acknowledge, and the record reflects, that Mother participated in the services offered by DCS. Indeed, each family case manager who testified at the termination hearing stated that Mother was attending individual and family counseling, participating in supervised visits with the Children, had completed parenting classes and submitted to psychological testing, was staying in touch with DCS, submitting to random drug screens, had stopped abusing alcohol, and was taking her medications as prescribed. FCM Orr testified that Mother "loves her children very much" and this same sentiment was echoed by other FCMs that had worked with Mother throughout the CHINS proceedings. *Transcript* at 18. To be sure, the juvenile court acknowledged this fact in its termination order. Even given her efforts and her desire to be a parent for the Children, the FCMs who had been assigned to and had worked with Mother each testified as to their concerns about Mother's ability to be a parent to the Children in addition to her ability to care for herself. FCM Orr believed that Mother's mental health and lack of stability significantly interfere with her ability to be a parent. Mother's lack of coping

10

skills to handle day-to-day activities was also a concern. These same concerns were shared by others who had worked with Mother.

Further, the record demonstrates that over the course of two years, Mother never obtained or maintained a stable source of income and failed to demonstrate that she could provide for herself, let alone provide for the Children. DCS made every effort to address its concerns, including concerns with Mother's mental health, and yet more than two years later, those concerns remain.

The evidence presented by the State as outlined above supports the juvenile court's determination that there is a reasonable probability that the conditions resulting in removal of the Children from the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of the Children. Further, we may not reweigh the evidence and second-guess the conclusions reached by numerous individuals involved in this case that termination is in the best interests of the Children. We agree with several of the FCMs that, at this point, permanency for the Children is a paramount consideration. Even after receiving and participating in a multitude of services over the course of two years, Mother is still not in a position, and evidence presented suggests she may never be in a position, to provide for and parent the Children. We therefore conclude that the juvenile court's termination of Mother's parental rights is supported by clear and convincing evidence.

Judgment affirmed.


MATHIAS, J., and PYLE, J., concur.

11