R.G. and T.G., Appellants–Respondents,

v.

MARION COUNTY OFFICE, DEPARTMENT OF FAMILY AND CHILDREN, Appellee–Petitioner.

No. 49A02–9405–JV–243.

Court of Appeals of Indiana, Third District.

Feb. 22, 1995.

Transfer Denied June 28, 1995.

Mark E. Bell, Bell & Bell, Indianapolis, for appellants.

Elizabeth G. Filipow, Marion County Dept. of Public Welfare, Indianapolis, for appellee.

## OPINION

STATON, Judge.

R.G. ("Mother") and T.G. ("Father") appeal from the trial court's judgment terminating their parental rights. They present three issues for our review which we consolidate into two and restate as follows:

I. Whether there was sufficient evidence to support the judgment.

II. Whether the trial court improperly considered Mother and Father's mental disabilities as a determining factor in its decision to terminate their parental rights.

We affirm.

Mother and Father are the parents of B.J.G., who was born on March 28, 1989. Mother and Father have been diagnosed as mildly retarded with I.Q.'s of 64 and 62, respectively. B.J.G. was born five weeks premature and was on a sleep apnea monitor and oxygen support from age six weeks through eighteen months.[1] B.J.G. was placed in respite care with a foster family in April 1989.[2] B.J.G. was declared a "Child in Need of Services" by the Marion County Office of Family and Children ("MCOFC") on May 17, 1989 and placed in foster care.[3]

On July 18, 1989, Mother and Father signed an Agreed Entry which was approved by the Marion Superior Court, Juvenile Division, wherein they agreed that B.J.G. would remain in foster care so long as he needed the apnea monitor. Upon B.J.G.'s removal from the apnea monitor, Mother and Father agreed to: (1) gradually increased supervised visits with B.J.G.; (2) overnight visits with B.J.G. upon recommendation from his supervising nurse; (3) participate in counseling and parent training; (4) cooperate with the Semi–Independent Living Program of Noble Centers ("SLIPS")[4]; and (5) attend B.J.G.'s medical appointments.

One hundred and fifty six supervised visits were scheduled from January 11, 1990 through November 18, 1991 of which Mother and Father attended 112. The supervised visits were then stopped based upon MCOFC's determination that Mother and Father were not sufficiently progressing from their counseling and training. MCOFC filed a petition for termination on November

---

1. Sleep apnea is the inability to breathe during sleep caused by an upper airway obstruction and is associated with frequent awakening and daytime sleepiness. Stedman's Medical Dictionary 106 (25th Ed.1990).

2. Respite care was provided for Mother and B.J.G. after they left the hospital. Respite care is normally a short term solution until a more permanent living situation can be arranged. Mother and B.J.G. were placed in the home of B.J.G.'s current foster parents. During respite care, the caregiver provided services for Mother and B.J.G. and attempted to instruct Mother on how to properly care for the child. The respite care arrangement ended when B.J.G. was hospitalized for pneumonia in May 1989.

3. After his hospital release for pneumonia, B.J.G. returned to the same family who provided respite care.

4. Semi-independent living programs (SLIPS) are available to developmentally disabled adults through several community agencies. The program allows individuals to live in his or her own residence, with assistance from an agency worker who spends approximately two hours per week with the individual, assisting the individual with learning independent living skills such as: budgeting, financial planning, using and managing a checking account, grocery shopping, cooking, and obtaining necessary medical care.

18, 1992. After a hearing, the trial court granted MCOFC's petition.

## I.

### Sufficiency of the Evidence

Mother and Father contend that there was insufficient evidence to support the trial court's judgment terminating their rights.

■ Where the trial court has heard evidence and has had the opportunity to judge the credibility of witnesses, we will not set aside the judgment unless it is clearly erroneous. *Egly v. Blackford County DPW* (1992), Ind., 592 N.E.2d 1232, 1234–35. When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. We will consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id.* at 1235.

To effect the involuntary termination of a parent-child relationship, the following elements must be supported by clear and convincing evidence:

(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that:

(A) the conditions that resulted in the child's removal will not be remedied; or

(B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child.

IND.CODE 31–6–5–4(c) (1993).

Mother and Father contend that the evidence does not suggest that there was a reasonable probability that they would never be able to independently parent B.J.G. Mother and Father also state that there was insufficient evidence to prove that termination of their parental rights was in the best interests of B.J.G.

■ In evaluating the circumstances of terminating parental rights, the court must subordinate the interests of the parents to those of the children. *In re Children: T.C. and Parents: P.C.* (1994), Ind.App., 630 N.E.2d 1368, 1373, *reh. denied.* Termination of parental rights is proper where the children's emotional and physical development is threatened. *Matter of A.M.* (1993), 596 N.E.2d 236, 238, *trans. denied.*

■ The trial court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *J.L.L. v. Madison County DPW* (1994), Ind.App., 628 N.E.2d 1223, 1227.

■ To determine whether there is a reasonable probability that the condition which resulted in the removal of the child from the parent will not be remedied, the trial court must judge the parents' fitness for the care of their child as of the time of the termination hearing taking into account any evidence of changed conditions. *Egly, supra,* at 1234. The court must also evaluate the parents' pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

■ Mother and Father contend that their gradual progression in counseling and parental training is indicative of their potential to raise B.J.G. independently at some point in the future, and that because of this potential, their parental rights should not be terminated.

The record indicates that Mother and Father have shown isolated areas of improvement in attending to B.J.G. during their supervised visits. The registered nurse who supervised the visits between B.J.G. and Mother and Father testified that Mother had learned to change B.J.G.'s diapers without prompting, placed B.J.G. in his car seat without assistance, and encouraged B.J.G. to eat his meal independently with a spoon. The nurse also stated that Mother and Father were able to understand the importance of home safety and could identify several age

related developments such as crawling, walking, and talking.[5]

However, the nurse testified that she could not recommend unsupervised visits or overnight visits between them because such visits could potentially endanger the safety of B.J.G. She indicated that during such visits, Mother and Father would be unable to meet B.J.G.'s basic needs because they would be unable to determine when B.J.G. was in need of a medical emergency, whether B.J.G. was getting food properly, and whether B.J.G. needed a change in diapers. In her reports, she noted that during the supervised visitations, that B.J.G. often ate the lunch prepared by his foster mother because Mother and Father did not have enough money to feed the child and that Mother and Father mentioned they had financial problems.[6]

The record shows that Mother and Father are no longer involved in the SLIPS program. Father indicated that he did not require any help and Mother stated that she can do things on her own. However, a case worker assigned to Mother, testified that Mother would benefit from being in a SLIPS program because she needed assistance with managing her finances and her household duties. The case worker also stated that Mother needed help keeping track of her medical appointments and instruction while grocery shopping in order for her to learn about nutrition. A social worker who was involved with Father testified that Father has had trouble managing his finances and has occasionally told her that they had no food. The social worker stated that Father would benefit from the SLIPS program as well.

A psychologist who performed a case analysis on Mother and Father, stated that Mother and Father would not be able to provide even minimally sufficient care for B.J.G. and if put in their care, B.J.G. would not reach his full potential. The psychologist recommended that B.J.G. not be placed in Mother and Father's exclusive care.

B.J.G.'s developmental pediatrician, Dr. Nancy Dodge, testified that B.J.G. is moderately to severely developmentally delayed and requires physical, occupational, and speech and language therapy. B.J.G. suffers from hydrocephalus[7] which required the placement of a shunt, a mechanical device which drains the extra fluid off the brain and into the abdomen.[8] B.J.G. has required eye surgery and hernia surgery. She anticipated that B.J.G. would not catch up developmentally, always be dependent on others to a certain extent, require special education services, and require maintenance and follow-up of his shunt. She concluded that without therapy and medical care his development would be detrimentally affected.

Mother testified that she has not attended any of B.J.G.'s doctor's appointments in the last few years and that she has never attended any of his therapy appointments.

Finally, the record reveals that B.J.G. has bonded with the foster parents and the foster parents have provided B.J.G. with a stable home. The foster parents have expressed their desire to adopt B.J.G. after the parental rights of the parents are terminated. The foster parents stated that B.J.G. has resided continuously with them since B.J.G. was two weeks old and that they plan to continue with

5. However, the record reveals that during a subsequent visitation, the nurse reported that Mother and Father were unable to recall their previous discussion on child growth and development.

6. The record indicates that Mother and Father have minimal reading and arithmetic skills and have difficulty making change from small dollar amounts. However, both are able to write their names, address an envelope, and are employed. Father works as price labeller in a grocery store and Mother works at Goodwill but is laid off periodically for lack of work.

7. Hydrocephalus is a condition marked by an excessive accumulation of fluid in the brain which causes increased pressure on the brain

resulting in the interference with brain functions. Stedman's Medical Dictionary 731 (25th Ed.1990).

8. Dodge stated that B.J.G. could experience symptoms such as fever, vomiting, change in eye movements, change in speech, and decreased levels of consciousness which could indicate that either B.J.G. has outgrown the shunt or that the shunt is malfunctioning. Dodge indicated that without medical attention in such instances, B.J.G. could suffer seizures, brain damage, and possible death.

B.J.G.'s therapy and medical treatment with Dr. Dodge.[9]

While we acknowledge Mother's love and affection for B.J.G., the evidence indicates that she and her husband failed to continue with the SLIPS program, failed to progress from the training received during the supervised visits, failed to become involved in B.J.G.'s medical and therapeutic care, and lacked the skills and knowledge necessary to fulfill the obligations of a parent to a child with the specialized needs of B.J.G. This evidence, along with the showing of B.J.G.'s current lifestyle with his foster family, supports the trial court's determination that Mother and Father were unable to remedy the conditions which caused B.J.G. to be removed from their care and that termination was in B.J.G.'s best interests. We therefore conclude that the trial court's judgment was not clearly erroneous.

## II.

### Consideration of Mental Disability

Mother and Father contend that the trial court improperly based its decision to terminate their parental rights on their mental disability. Mental retardation of the parents, standing alone, is not a proper ground for terminating parental rights. *Egly, supra,* at 1234. However, in instances where the parents are incapable of or unwilling to fulfill their legal obligations in caring for their child, mental illness may be considered. *Id.* This includes situations not only where the child is in immediate danger of losing his life, but also where the child's emotional and physical development will be threatened. *Id.*

As the facts shown *supra* indicate, Mother and Father have been both unable and un-

willing to develop the skills necessary to fulfill their legal obligations as a parent.[10] In these instances, the trial court may consider the parents' mental deficiencies in making their determination. *Egly, supra,* at 1234.

As such, we determine that the trial court properly considered Mother and Father's mental disabilities in light of their incapability and unwillingness to fulfill their obligations to B.J.G.

We therefore conclude that the trial court did not err in its determination to terminate Mother and Father's parental rights.

Affirmed.

FRIEDLANDER, J., concurs.

SULLIVAN, J., concurs in result and files separate opinion.

SULLIVAN, J., concurring in result.

Were it not for the individualized medical necessities required by the child and the reasonable conclusion that R.G. and T.G. are, and will be in the future, unable to recognize and deal with possible symptoms and emergencies, I would dissent. *See Dull v. Delaware County Department of Public Welfare* (1988) 2d Dist. Ind.App., 521 N.E.2d 972, 977 (Sullivan, J., dissenting). The existence of those factors, however, prompt my concurrence in result.

I do not subscribe to the possible failure of the child to "reach his full potential" (at 329) as a basis for termination of parental rights. Neither do I agree with the implication of the majority opinion that "the current lifestyle with his foster family" (at 330) or that the foster home environment as more condu-

---

9. We note also that B.J.G.'s foster mother has worked extensively with the physical and mentally handicapped including developmentally disabled children and adults. She has worked specifically in areas focusing on developmental programs for mentally handicapped children.

10. Mother and Father concede that they have deficiencies which are brought on by their mental retardation. Mother and Father argue that their "poor money management skills, occasionally forgetting diapers, [and] lack of experience in treating [B.J.G.'s] shunt are not immediate threats to the child." Appellant's Reply Br. at 4.

However, they contend that the court must refuse to consider these deficiencies in determining whether to terminate their rights because they do not pose an immediate threat to the child. We disagree with their contention. Our supreme court noted in *Egly* that parental rights may be terminated not only in instances where the parents' deficiencies pose an immediate danger to the child's life *but also* in instances where the child's emotional and physical development are threatened. *Egly, supra,* at 1234 (emphasis added).

cive to the child's "development," justifies termination of parental rights.

For the reasons stated, I concur in result.