**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**ANA M. QUIRK**
Public Defender
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**JAMES E. MOORE**
DCS, Delaware County
Muncie, Indiana



FILED

Mar 05 2013, 9:05 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION )
OF THE PARENT-CHILD RELATIONSHIP )
OF H.M., (minor child) )
             )
        and             )
             )
R.M., (father) )
             )
       Appellant-Respondent, )
             )
        vs.          )    No.  18A02-1207-JT-626
             )
INDIANA DEPARTMENT OF )
CHILD SERVICES, )
             )
       Appellee-Petitioner. )

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable Linda Ralu Wolf, Judge
The Honorable Brian Pierce, Magistrate
Cause No. 18C03-1207-JT-626

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

Case Summary and Issue

R.M. ("Father") appeals the termination of his parental rights. He presents one issue on appeal: whether sufficient evidence supported the termination of his parental rights. Concluding that the termination was supported by sufficient evidence, we affirm.

Facts and Procedural History

H.M. is the daughter of Father and B.M. ("Mother"). On March 4, 2010, when H.M. was a year-and-a-half old, she was emergently removed from her home, along with two half-siblings, by the Indiana Department of Child Services ("DCS"). The removal was precipitated when another half-sibling, L.M., presented at Riley Hospital for Children the day before and doctors expressed concerns about serious child abuse. L.M.'s history and physical presentation at the hospital revealed a five year old child who had been abused over the course of months, and who showed physical and psychological deterioration over that period.

A summary of L.M.'s case follows. L.M. was the biological daughter of Father but not of Mother. She was a healthy, potty-trained, talkative child when she went to live with Father and Mother in August of 2009. Before coming to live with Father and Mother, L.M. was living with her biological mother. Two other adults lived in the house with Mother, Father, and the four children, and Father worked from 7:00 a.m. to 3:30 p.m. In November

2

2009, L.M. was taken to an emergency room for a red and painful eye. She weighed thirty-eight pounds at the time, and the doctor noted that she had no physical problems aside from the eye, and did not note any mental issues. In December 2009, L.M. began swearing and smearing feces on objects around the house. She also began to see little blue bunnies that told her to do bad things. That month, she was taken to the emergency room with a report that she had jumped off of a bed, and was found to have fractures in multiple fingers on her right hand. Also that month, the family went to a church Christmas party and after they arrived in the parking lot, L.M. would not get out of the car and was swearing repeatedly. The family asked the pastor for help, and he saw L.M. rocking back and forth in her car seat and was still swearing repeatedly. He told Father that L.M. needed to see a child psychologist. Once they finally got L.M. inside, she stood to the side and did not interact with other children, and she seemed pale and frail.

On multiple occasions, Father witnessed L.M. being abused by Mother and another adult in the house. She was hit with a wooden stick made from pieces of a wooden crib, and when Father threw the stick away, Mother made another one. After L.M. was hit with the stick on the bottom of her feet, she was forced to do jumping jacks until she vomited. On several occasions, L.M. was made to hold heavy objects out to her side for a minute or more. She was also hit with wet rags, and when Father asked why wet rags were being used, Mother responded that it was to avoid leaving bruising and that L.M. needed to be hit because she was bad and Mother wanted to break her. The record indicates that the other children were not abused the way that L.M. was. Mother would force feed L.M. until she

became sick and vomited, at which point Mother would hit the bottom of L.M.'s feet with a stick and then make her do jumping jacks until she vomited again. By late December 2009, L.M. was attempting to smear feces on the other children and on Father when he returned home from work.

In January 2010, Father began taking classes at night, such that he would be home for approximately forty-five minutes after work, and then would go to class and arrive back at home around 9:30 p.m., after the children were asleep. An uncle who lived next door noticed L.M.'s health and demeanor deteriorate in December 2009, and January 2010. When Father was questioned about this, he replied that L.M. had an eating disorder and they were supposed to get a prescription for her. The uncle specifically noted that L.M. had been happy when she first moved in with Mother and Father, but was the opposite in terms of demeanor by January 2010. When the uncle would visit, he found L.M. in the basement and she would tell him that she was not allowed to come upstairs.

In February 2010, L.M. was taken to an urgent care clinic where Mother and Father reported that she was complaining of painful urination. The parents reported that L.M. had been potty-trained, but by now had regressed and had to be in diapers. After the exam, L.M. retracted into a defensive position and began to hit herself in the forehead with her fists. The family was referred to a mental health service provider and was told to follow up with their primary care physician. A few days later, Mother and Father took L.M. to meet with a therapist. L.M. was small for her age, very quiet, and slept for most of the session. Mother reported that in addition to the issues noted above, L.M. would stand for hours without

4

moving, and would eat out of the trash. Also, L.M. had hidden a knife under her mattress and had threatened to hurt someone with it. Mother also reported that L.M. exhibited sexual behavior. The therapist got in touch with Child Protective Services. At the next therapy appointment, the therapist noted that L.M. was very withdrawn, showed no emotion, and was miserable. L.M. told the therapist that one of the other adults in the house made her take cold showers and would bend her fingers back as punishment. When the therapist told Father and Mother about possible follow-up care, they seemed uninterested.

At the beginning of March, L.M. had another therapy appointment, and had physically deteriorated in the week since her last appointment. She had dark circles under her eyes, was pale, looked exhausted and fragile, and looked like she was not eating or sleeping. On the morning of March 2, 2010, Mother called Father at lunch to tell him that L.M. had fallen at the dentist's office and was going to have a black eye. A couple of hours later, she called again to tell him that they needed to take L.M. to the hospital because she was holding her head and screaming of a headache. She was taken to the hospital by ambulance, where the paramedics noted that she was emaciated. At the hospital, the paramedic warned the nurse of L.M.'s wasted state to prepare her for what she was going to see, explaining that it was not the type of thing you usually see in America. The nurse noted that L.M. was emaciated, had both new and old bruises, her lips were cracked, and her hair was thin. For some reason, L.M. was discharged that evening. A couple of hours later, Mother called Father at school to tell him that L.M. was having a mental breakdown. They found a mental hospital a couple of

hours away and drove L.M. there; once there, because the condition was medical, they were referred to Riley Hospital for Children.

By the time L.M. arrived at Riley that night, approximately six months after she came to live with Mother and Father, she was malnourished, dehydrated, extremely lethargic, emaciated, and had zero body fat; she was covered in bruises; she weighed twenty-eight pounds; she appeared to have been force-fed salt; she had an altered mental status; and she was seizing. In addition to the multiple issues outlined above, the doctors discovered that L.M. had been chewing her own fingers and toes to the point of bleeding, and in addition to eating out of the trash, would also eat her own vomit and feces. She had never been taken to a primary care physician, although one had been reported the times she was taken to the emergency room or urgent care clinic. The other children however had been taken to the reported primary care physician. L.M. had to be put on a ventilator at Riley, and ultimately she died several days later, having never left the hospital.

Both Father and Mother were charged in the death of L.M. Father pleaded guilty to neglect of a dependent as a Class B felony, in an agreement that left the sentence to the discretion of the court; he had not been sentenced by the time of the fact-finding hearing for the termination underlying this appeal. Mother was found guilty of neglect of a dependent resulting in death, as a Class A felony, and was sentenced to fifty years executed.

After H.M. was removed from the home, Child in Need of Services ("CHINS") proceedings were initiated, and H.M. was eventually determined to be a CHINS. Once H.M. had been in the care of DCS for fifteen months, DCS was required to file a petition for

involuntary termination of parental rights.[1] The petition was filed in July of 2011, and a fact-finding hearing was held on March 8, 2012. Following the fact-finding hearing, the trial court issued findings of fact and conclusions of law and terminated the parent-child relationship between H.M. and Father.[2] This appeal followed.

## Discussion and Decision

### I. Standard of Review

In determining whether the evidence is sufficient to support a judgment terminating parental rights, we neither reweigh the evidence nor judge the credibility of the witnesses. In re D.J., 755 N.E.2d 679, 683 (Ind. Ct. App. 2001), trans. denied. We consider only the evidence favorable to the judgment and the reasonable inferences to be drawn therefrom. Id. When reviewing the findings of fact and conclusions of law upon which a termination of parental rights is premised, we engage in a two-tiered standard of review: we first determine whether the evidence supports the findings, and second, whether the findings support the judgment. Id. We will reverse only upon a showing of clear error. Id. A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. In re A.J., 877 N.E.2d 805, 815 (Ind. Ct. App. 2007), trans. denied. A judgment is clearly erroneous only if the findings of fact do not support the trial court's conclusions thereon, or the conclusions thereon do not support the judgment. Id.

---

[1] H.M.'s surviving two half-siblings were in the custody of their other respective biological parents by the time of the fact-finding hearing for termination of parental rights, and so were not part of the termination proceedings underlying this appeal.

[2] Mother's parental rights were also terminated, but she does not participate in this appeal.

In evaluating the circumstances surrounding the termination, the court must subordinate the interests of the parents to those of the child. R.G. v. Marion Cnty. Office, Dep't of Family & Children, 647 N.E.2d 326, 328 (Ind. Ct. App. 1995), trans. denied. Termination of parental rights is proper where the child's emotional and physical development is threatened. Id. The trial court need not wait until the child is irreversibly harmed such that his physical, mental and social development is permanently impaired before terminating the parent-child relationship. Id.

## II. Termination of Parental Rights

To effect the involuntary termination of a parent-child relationship, the following elements must be proven by clear and convincing evidence:

> (A) that one (1) of the following is true:
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2); see also Ind. Code § 31-35-2-8.

Father does not contest that sub-sections (A) and (D) were met; Father contests that sub-section (C) was met, although he does not develop this argument. Father also contests that sub-section (B) was met. We note that the court was only required to conclude that one of the conditions of sub-section (B) was met, although the court concluded that both (i) and (ii) were true in this case. We also note that the same evidence may be used to prove more than one element of the statute. See In re A.K., 924 N.E.2d 212, 221 (Ind. Ct. App. 2010), trans. dismissed.

We agree at the outset that the court here did not do as good a job as we would have liked in linking H.M. and Father to the requirements of the statute. However, we can affirm on any ground supported by the record, City of S. Bend v. Century Indem. Co., 821 N.E.2d 5, 9 (Ind. Ct. App. 2005), decision clarified on reh'g, 824 N.E.2d 794, trans. denied, and here the record supports the conclusion that, at the very least, there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child, and that termination is in the best interests of the child.

Here, Father faces between six and twenty years for his Class B felony neglect conviction. Ind. Code § 35-50-2-5. Incarceration of a parent is an appropriate consideration in the termination of parental rights. See In re J.M., 908 N.E.2d 191, 192, 192 n.1 (Ind. 2009) (noting that the supreme court has regularly denied transfer in cases where the Court of Appeals has affirmed the termination of parental rights of incarcerated parents, and cautioning that a recent spate of cases in which termination of parental rights of incarcerated

9

parents was deemed to be unwarranted does not reflect a presumption that termination is unwarranted in all such cases); Everhart v. Scott Cnty. Office of Family & Children, 779 N.E.2d 1225, 1234 (Ind. Ct. App. 2002) (considering incarceration as a factor in terminating parental rights), trans. denied.

More significantly, Father's history with L.M. shows an appalling inability or unwillingness to protect his child from deadly abuse. This in the face of a record that shows that Father not only knew that L.M. was being abused, but that L.M.'s physical and mental state were such that any adult caretaker should have known that something was very wrong, and that even her earlier manifestations would have been cause for medical intervention. We need not wait until a child is irreversibly harmed before terminating the parent-child relationship, and we conclude that the record here supplies sufficient evidence that placing H.M. in the care of Father would present a reasonable probability that H.M.'s well-being would be threatened. While the record does not indicate that H.M. was herself the subject of abuse, we shudder to think how tenuous her well-being would be if responsibility for her care and protection were placed in Father's hands, having already seen his response (or lack thereof) when another of his children was endangered. Having determined that sub-section (B)(ii) of the statute has been met, we need not analyze whether (B)(i) has also been met, as only one finding is necessary under the statute.

With respect to the best interests of the child, we look beyond the factors identified by DCS and to the totality of the evidence. In re A.B., 887 N.E.2d 158, 167 (Ind. Ct. App. 2008). Here, the DCS Family Case Manager who was responsible for H.M.'s case testified

10

that she believed that termination was in H.M.'s best interest. Additionally, the evidence of Father's failure to protect another of his children from ongoing abuse that ultimately led to that child's death indicates that it would be in H.M.'s best interest for Father's parental rights to be terminated.

## Conclusion

Concluding that there was sufficient evidence to support the trial court's termination of parental rights because termination is in H.M.'s best interests and there is a reasonable probability that the continuation of the parent-child relationship would pose a threat to H.M.'s well-being, we affirm.

Affirmed.

MAY, J., and PYLE, J., concur.