# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 24 2016, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Bruce N. Elliott
Marion, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of K.J. and J.J. (Minor Children), | May 24, 2016 |
| | Court of Appeals Case No. 27A02-1510-JT-1811 |
| R.J. (Mother) and Jo.J. (Father), | Appeal from the Grant Superior Court |
| *Appellants-Respondents,* | |
| v. | The Honorable Dana J. Kenworthy, Judge |
| Indiana Department of Child Services, | Trial Court Cause Nos. 27D02-1408-JT-17 and 27D02-1501-JT-2 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

# Statement of the Case

Jo.J. ("Father") and R.J. ("Mother") (collectively "Parents") appeal the trial court's termination of their parental rights over their minor children K.J. and J.J. ("Children"). Parents raise a single issue for our review, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of their parental rights over Children. We affirm.

# Facts and Procedural History

Father and Mother were married and living together in Marion when Mother gave birth to K.J. on May 20, 2013. K.J. was hospitalized for approximately two months after her birth due to multiple health issues, including hypoxic ischemic encephalopathy. On July 11, DCS filed a petition alleging that K.J. was a child in need of services ("CHINS"). And on July 18, Parents admitted that the following allegations in the CHINS petition were true:

   a.   That their home was in need of repairs due to a water line break, which caused mold in the back bedroom.

   b.   That their home was infested with fleas.

   c.   That their home was not suitable for [K.J.] upon her release from the hospital.

   d.   That they were living in temporary housing until their home became appropriate.

e.      That [K.J.] had continuing medical needs and they would benefit from services to assist them in meeting her needs.

f.      That Mother had an older child removed from her care and not reunified with her.

Appellants' App. at 50-51. Accordingly, the trial court ordered that K.J. was a CHINS, and the court ordered Parents to comply with a parental participation plan. On September 20, "due to further allegations of neglect," DCS removed K.J. from Parents' care and placed her in foster care. *Id.* at 51. Parents began supervised visitation with K.J. at that time.

[3] On April 7, 2014, Mother gave birth to J.J. On April 10, DCS filed a petition alleging that J.J. was a CHINS, and, with a court order, DCS took J.J. into custody. Following an initial hearing, the trial court ordered that J.J. was a CHINS, and she was placed into foster care.

[4] On August 12, 2014, and January 22, 2015, DCS filed petitions to terminate Parents' parental rights as to K.J. and J.J., respectively. Following a final evidentiary hearing on those petitions over the course of four days and concluding on June 4, 2015, the trial court issued its order terminating Parents' parental rights to Children. In that order, the trial court entered remarkably

detailed findings and conclusions. DCS has summarized the critical findings

supporting termination as follows:[1]

> 21. *Mother's Prior CHINS Involvement*. Mother had a ten-year[-]old child, H.D., who[m] Montana state authorities removed from Mother's care. The case was open for 18 months and Mother was required to participate in services. Child H.D. never returned to Mother and Maternal Grandmother, who lives in Arizona, adopted child.
>
> 22. *The Children's Special Medical Needs*. Children both have special medical needs. Child J.J. was born premature and suffers from seizures, ischemic encephalopathy, and has one functioning kidney. Child K.J. also suffers from seizures. Children both take seizure medications. Children are regularly seen by doctors and at Riley Children's Hospital.
>
> Parents do not understand fully Children's medical issues nor have they been involved fully in their medical care. Despite the court ordering Parents to attend Children's medical appointments, they have attended very few of them. They do not know the names of Children's doctors and they do not know the medications or dosages given to Children. Because of Parents' pattern of passivity and non-involvement, the court finds Parents' assertion that they will meet Children's medical needs when they are returned to them to be dubious. There is a reasonable probability that Parents would not appropriately attend to Children's medical needs.
>
> 23. *The Children's Developmental Delays*. Children both have developmental delays. Child K.J. has delays in her cognitive,

---

[1] Parents do not challenge the accuracy of DCS's summary of the findings, and our close review of the summaries of each finding reveals that they are accurate. We adopt DCS's summary of the findings here for the sake of efficiency.

social, expressive, and fine and gross motor skills. Child J.J. has delays in her expressive, social-emotional, and fine and gross motor skills. Services have been provided to the family three times a week since April 2014 to assist Parents in working with Children to achieve developmental milestones.

Although Parents have good attendance and have shown improvement, they have not been able to consistently implement the skills taught to them without redirection or the provider's continued direct involvement. Parents lack appropriate motivation and urgency. Also, they lack understanding of Children's developmental delays and Father outright denies Children have such a problem. The provider has concerns about Parent's lack of parenting skills and their inability to remedy the poor living conditions. The court finds that there is a reasonable probability that Parents would not be able to help Children improve their developmental delays.

24. *Unsafe Home Conditions*. The court ordered parents to clean their home and maintain it in a safe condition. DCS provided parents with case management services through several providers to help them improve the condition of the home. Despite two years with several providers, Parents had not improved the condition of the home in that there remained "hazardous clutter and dangerous items left within reach of small children, i.e., antifreeze, motor oil, lighters, potting soil, overflowing litter boxes full of cat feces, chemicals, and trash." One service provided ended services after Father got into an argument with them. Mother acknowledged that progress had been slow. Parents were not able to demonstrate skills taught to them. The court finds that there is a reasonable probability that Parents will not be able to keep their home in a condition that is safe and suitable for Children.

25. *Parents' Contact with DCS*. Parents maintained contact with DCS and signed all required releases.

26. *Inadequate Parenting Skills*. Parents regularly attended supervised visitation with Children. During the CHINS case, visitation never moved past supervised. Although Parents appear to love Children and have a bond with them, they have not improved in their ability to care appropriately and safely for them. Parents do not closely supervise Children. Providers supervising visits question whether Parents have benefitted from services because they are not able to apply the skills they have learned. Parents make excuses, are defensive, and are resistant to suggestions. DCS and providers have experienced conflict with Parents regarding parenting issues and DCS observed, at a time when DCS removed child K.J. from the home, Father "acting erratically, cursing, yelling and acting threatening, such that law enforcement had to be called." Mother usually remains in one position sitting on the couch during visits and does not interact fully with Children. Parents both have fallen asleep on numerous occasions during visits.

27. *Common Sense Parenting Program*. Parents completed parenting classes. Mother admitted that the classes were of little benefit and Father fell asleep during some of the class time. Despite their completion, concerns remained about their ability to appropriately care for Children.

28. *FCM Visits to the Home*. Parents denied DCS' access to the home on at least two occasions and denied DCS the ability to take pictures of the home.

29. *Parents' Finances*. Father is the beneficiary of a family trust, he receives $502 per month in government disability, and earns additional income from several part-time jobs. Mother is not employed and says she receives $708 per month in Social Security. Parents have adequate income to pay their bills but make questionable financial decisions that sometimes leave them without income to buy such things as gasoline for their vehicle. Parents are renting to own a trailer and obtain most of their household furnishings from rent-to-own stores. Parents have

made questionable purchases on such items as a big screen television and the latest iPhones. Parents have received help with budgeting and have been advised that if they continue their current spending habits, the funds in their trust will be depleted by 2025. Parents have shown resistance to suggestions regarding their finances by becoming angry and defensive.

30. *Parenting/Psychological/IQ Assessments.* Parents both completed parenting assessments and IQ tests including the Child Abuse Potential Inventory ("CAPI"), the Minnesota Multiphasic Personality Inventory 2 ("MMPI-2"), and the Wechsler tool to measure intellectual functioning.

Mother's testing results for CAPI were invalid because she presented herself in an overly positive way. The MMPI-2 showed that she "may tend to deviate from a normal way of doing things when she is frustrated, she has a high resistance to self-disclosure, has a tendency to minimize problems and not see them as significant when they may very well be." As for intelligence, she tested in the "slow normal range" with a full scale IQ of 77, which is in the borderline range. She has a severe learning disability particularly in verbal learning. The psychologist administering the testing has predominant concerns about Mother's ability to parent Children because of her tendency to deny and minimize problems.

Father's CAPI results indicated an elevated rigidity scale score, which shows Father to be inflexible and potentially overly critical and demanding. This can contribute to abuse and neglect and indicate relationship problems with Children. The overall results were concerning.

Father's MMPI-2 results indicated that Father has "problems with ongoing anxiety, has a negative view of his environment and society, has very negative attitudes towards treatment and social service organizations, tends to become aggressive when frustrated, tends to minimize problems, is socially insecure, has a

high resistance to self-disclosure, has more stressors related to his marital relationship than he admits, has a low motivation to change, has a high level of denial of problems, has significant problems with social relationships, and has trust issues." In addition, the results indicate Schizoid features such as difficulty relating to others and expressing feelings appropriately. Based on the MMPI-2 results, the psychologist diagnosed Father with Personality Disorder with Schizoid and Paranoid Features.

Father's full scale IQ was 60, which placed him in the mildly impaired range. The psychologist had concerns about Father's ability to parent Children because of his low motivation, negative outlook, and low intellectual functioning.

31. *Family Counseling*. Parents have been involved in counseling since June 25, 2014. Goals included reunification and Parent's role and responsibility in Children's removal. Parent's counselor indicated that although Parents made some progress, they did not meet the goals. The counselor characterized parents as "overwhelmed by the system" and they were limited in their ability to understand issues. The counselor also noted that Parents frequented a local strip club and sought emotional support from the club employees. The counselor expressed concerns about Parents ability to provide full-time care for Children. Their success would depend on an ability to understand Children and Children's needs, but Parents lack the intellectual ability and character to do so. They have been unable to apply the skills taught to them.

32. *FCM Hullinger's Recommendation*. The FCM never recommended the return of Children to Parents' care because of the condition of the home and Parents' inability to parent them safely. Termination is in Children's best interests because of Parents inability to follow instructions and utilize the thing taught to them.

33. *CASA's Recommendations*.  CASA agreed that Parents have not resolved the conditions of Children's removal and that reunification would pose a threat to Children's wellbeing.  Children have been in their current foster home for most of their lives and are bonded, they feel safe, and are doing well.  CASA agreed with the DCS' plan of adoption.

34. *Best Interests*.  Termination of parental rights is in Children's best interests.

35. *Permanency Plan*.  Adoption is a satisfactory plan.

Appellee's Br. at 21-24 (summarizing findings found at Appellants' App. at 53-71).  And the trial court entered the following relevant conclusions:

2.      There is a reasonable probability that:

    a.      The conditions which resulted in [Children's] removal and continued placement outside the home will not be remedied;

    b.      Continuation of the parent-child relationship poses a threat to [Children's] wellbeing.

3.      Termination of parental rights is in [Children's] best interests.

4.      There is a satisfactory plan for the care and treatment of [Children], that being adoption.

Appellants' App. at 72.  This appeal ensued.

# Discussion and Decision

We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> * * *

> (C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[7] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[8] Here, in terminating Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment

contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9] Parents contend that the evidence is insufficient to support the trial court's findings underlying its conclusions that they will not remedy the conditions that resulted in Children's removal or that the continuation of the parent-child relationship poses a threat to the well-being of Children. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we only address the sufficiency of the evidence to support the trial court's conclusion that continuation of the parent-child relationships poses a threat to Children's well-being.[2]

[10] Parents devote much of the Argument section of their brief on appeal to the trial court's conclusion that the reasons for Children's removal will not be remedied.

---

[2] Parents do not challenge the trial court's conclusions that termination is in the Children's best interests or that there is a satisfactory plan for the care and treatment of the Children, namely, adoption.

With respect to the trial court's conclusion that continuation of the parent-child relationships poses a threat to Children's well-being, Parents state as follows:

> Without actual evidence that the parents are unwilling or unable to care for the girls' medical issues, the court improperly concluded that the girls' well-being was somehow threatened by living with their parents in the home that the parents had improved to make it safe.
>
> It is noteworthy that mother told the court that the girls were place[d] in Early Head Start as infants. . . .
>
> With the continued help of such programs, there is nothing in the record to substantiate the contention that these parents are a danger to the well[-]being of these children.
>
> There was insufficient evidence presented as to what the girls' specific medical needs are that these parents are either unwilling or unable to meet, or couldn't meet satisfactorily with help from family service programs. . . .

Appellants' Br. at 25-26.

[11] Parents' contentions on appeal amount to a request that we reweigh the evidence, which we will not do. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Shupperd v. Miami Cnty. Div. of Family & Children (In re E.S.)*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id.*

[12] DCS presented evidence that K.J. was removed from Parents' care only a few months after her birth, and J.J. was removed from their care only a few days after her birth. Throughout the CHINS proceedings, Parents struggled to comply with the parental participation plans. The evidence shows that Parents struggled to maintain a clean and safe home environment for Children, and they did not engage in Children's extensive medical care. Parents' supervised visits with Children were marred by Mother's lack of interaction with Children, both parents' failure to practice good parenting skills, and both parents sleeping during visits. As Ed Pereira, Parents' family counselor, testified, Parents have poor judgment and would be unable to care for Children, who are both special needs. Pereira testified that the thought of Parents attempting to care for Children on their own "scare[d]" him. Tr. at 105.

[13] Still, Parents assert that "[m]ental disability, standing alone, is not a proper ground for terminating parental rights." Appellants' Br. at 24 (citing *R.G. v. Marion Cnty. Ofc., Dep't of Family & Children*, 647 N.E.2d 326, 330 (Ind. Ct. App. 1995), *trans. denied*). But Parents acknowledge that "their mental disabilities were [not] the sole issue cited by the trial court" in support of termination of their parental rights. *Id.* at 24-25. Indeed, while the trial court acknowledges Parents' IQs in its findings, the court's many other findings more than support termination of Parents' parental rights.

[14] The trial court's findings support the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationships pose a threat to Children's well-being. Again, Parents do not challenge the

remainder of the trial court's conclusions. We hold that the trial court did not err when it terminated Parents' parental rights to Children.

[15] Affirmed.

Robb, J., and Crone, J., concur.