## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 17 2020, 9:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEY FOR APPELLEE

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of M.G. (Minor Child), | June 17, 2020 |
| C.W. (Mother), | Court of Appeals Case No. 19A-JT-3076 |
| *Appellant-Respondent,* | Appeal from the Scott Superior Court |
| v. | The Honorable Marsha Owens Howser, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 72D01-1810-JT-62 |
| *Appellee-Petitioner* | |

**Baker, Judge.**

[1] C.W. (Mother) appeals the juvenile court's order terminating her parent-child relationship with M.G. (Minor Child), arguing that the evidence is insufficient to support the order. Finding the evidence sufficient, we affirm.

## Facts

[2] Minor Child was born to R.G. (Father)[1] and Mother on July 18, 2013. On August 9, 2016, law enforcement discovered then-three-year-old Minor Child walking alone down the middle of a busy street. After figuring out where Minor Child lived, officers went there and pounded on the door for approximately six minutes to speak with Minor Child's parents. Mother finally answered the door and proceeded to make the following claims to the police: that she was unaware that Minor Child was missing; that just days before, the Department of Child Services (DCS) had been harassing her to remove Minor Child from the home;[2] that DCS had inappropriately brought hallucinogens into her home; and that the fumes from those hallucinogens had prevented her from waking up. The officers became concerned about Mother's mental health and how her impaired judgment and reasoning were affecting Minor Child's livelihood.

[3] Law enforcement delivered their report to Family Case Manager (FCM) Caitlyn Hardin to assess the best solution going forward. They collectively decided that Minor Child's removal from the home was necessary given the

---

[1] Father is not a party to this appeal.

[2] At the time of this incident, Mother was already involved with DCS in another matter.

safety concerns surrounding Minor Child's temporary abandonment and Mother's mental stability. Minor Child was then promptly removed from Mother's care and custody. And soon thereafter, on August 11, 2016, DCS filed a petition alleging that Minor Child was a Child in Need of Services (CHINS). Initially, the juvenile court placed Minor Child in a foster care home that was near Mother's residence.

[4] On August 16, 2016, Mother underwent a psychological evaluation with Dr. Linda McIntire of Shelby Psychological Services. During the session, Dr. McIntire observed that Mother experienced delusions that impaired her reasoning and judgment and that Mother was unaware of the full impact of her mental illness. Ultimately, Dr. McIntire diagnosed Mother with schizophrenia and concluded that Mother could not safely provide and care for Minor Child given the seriousness of her illness. Mother explained to FCM Hardin that she believed the diagnosis was incorrect because, in her mind, Dr. McIntire was just a math teacher "posing as a psychiatrist." Tr. Vol. II p. 34.

[5] Following the factfinding hearing, on September 29, 2016, the juvenile court adjudicated Minor Child to be a CHINS and entered a dispositional decree. Per that dispositional decree, Mother was required to (1) undergo significant, individual psychological treatment; (2) maintain contact with DCS and provide updates; (3) participate in all DCS-recommended programs; (4) maintain stable employment and safe housing; (5) complete a parenting assessment and follow all accompanying recommendations; (6) participate in supervised visitations

with Minor Child; (7) refrain from using any illegal substance; and (8) complete up-to-date psychological examinations. *See generally* Ex. Vol. II p. 37-39.

[6] As part of her treatment regimen, Mother first attended sessions at the Lifesprings outpatient facility. There, Mother was required to participate in individual therapy, case management, and medical management. However, sometime in December 2016, Lifesprings discharged Mother, finding that her delusions were too severe for her to make any progress with its programs. Accordingly, Lifesprings recommended that Mother participate with an inpatient program at Wellstone before reengaging with outpatient treatment options. Unfortunately, Wellstone refused to provide Mother with any treatment based on its conclusion that she was not an active threat for committing suicide.

[7] Therefore, at the beginning of 2017, DCS referred Mother to Associates in Counseling and Psychotherapy (ACP), where Mother was to receive medication prescribed by a nurse practitioner. Though Mother participated in services, ACP noticed little progress because Mother refused to accept her schizophrenia diagnosis and "tak[e] ownership of her symptoms." Tr. Vol. II p. 37. Mother's personal ACP doctor then referred her to the Centerstone facility. At the conclusion of Mother's April 3, 2017, intake, Centerstone also diagnosed Mother with schizophrenia and recommended further inpatient services. However, Mother did not follow those recommendations and continued to deny that she suffered from schizophrenia. Along the way, DCS helped pay for Mother's medication to help her control her delusions so that she could begin

therapy. Centerstone even provided Mother with prescription cards to reduce the price of her medication for the same reason. On April 17, 2017, the juvenile court ordered that Minor Child be placed with her maternal grandmother, who lives in Chicago.

[8] By October 2017, Mother was participating with Centerstone's outpatient services, but her aggression and delusions further worsened. She claimed that she was unable to meet with a therapist alone, and she never started any inpatient services, despite multiple recommendations that she do so. For the next three months, Mother consistently refused to participate in required services and admit that she had mental health issues. Mother did keep in constant contact with FCM Hardin, who suspected that Mother had not been taking her prescription medication on schedule or even at all.

[9] In January 2018, FCM Shelly Campbell took over Mother's case and referred her to Ireland Home Based Services to address Mother's parenting skills. After her involvement with that program broke down, Mother returned to Lifesprings, which again recommended that Mother immediately be admitted to an inpatient program. FCM Campbell testified that Mother started to refuse to return drug screens and that Mother's behavior was "very erratic." *Id.* at 48. And when Mother did return drug screens, she tested positive for amphetamines and cocaine in May 2018.

[10] Moreover, while undergoing treatment, Mother gave birth to another child on June 9, 2018. That same day, DCS intervened immediately and removed the

newborn child from Mother's care and custody due to Mother's unresolved mental health issues. The record shows that Mother did not obtain prenatal care and smoked and drank heavily throughout this pregnancy. Mother's mental health continued to deteriorate after this point, and Mother showed no sign of attempting to start any new mental health treatment.

[11] During the CHINS proceedings, Mother rarely visited with Minor Child. DCS concedes that it was a long drive between Austin, Indiana—where Mother resides—and Chicago, Illinois—where Minor Child's maternal grandmother resides. However, Mother barely visited with Minor Child even when Minor Child was placed in foster care nearby. And even after DCS gave Mother a gas card and set up halfway visits in Lafayette, Indiana, Mother either cancelled the supervised visitations or did not show up at all. FCM Campbell testified that Mother's last supervised visitation with Minor Child was at a DCS office in summer 2018 and that the visitation was not productive.

[12] On October 16, 2018, DCS filed a petition for involuntary termination of the parent-child relationship between Mother and Minor Child. The juvenile court held a termination hearing on April 22, 2019, at which time Mother was incarcerated. FCM Hardin testified that because of Mother's ongoing mental health issues and her unwillingness to seek proper treatment or accept her diagnosis, Minor Child would be in danger if returned to Mother's care and custody. FCM Campbell testified that Mother could not provide for Minor Child's emotional needs and that Mother's instability would create an unsafe environment for Minor Child. Additionally, Court Appointed Special Advocate

(CASA) Lena Reynolds testified that termination was in Minor Child's best interests and that her maternal grandmother was ready and willing to adopt Minor Child.

[13] Eventually, on December 2, 2019,[3] the juvenile court issued an order terminating Mother's parent-child relationship with Minor Child. Mother now appeals.

# Discussion and Decision

## I. Standard of Review

[14] When reviewing an order on the termination of a parental relationship:

> We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment.
>
> Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not a license to reweigh the evidence.

*In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (internal citations omitted) (some internal quotations omitted). We must give "due regard" to the juvenile court's

---

[3] There is nothing in the record indicating why it took the juvenile court nearly eight months before it issued its order terminating Mother's parent-child relationship with Minor Child. We urge juvenile courts to be more expedient with these matters, especially when a child has been removed from a respondent parent's care and custody.

ability to judge witness credibility firsthand, and we will not set aside its findings or judgment unless clearly erroneous. *Id.*

[15] Pursuant to Indiana Code section 31-35-2-4(b)(2), DCS must prove the following in order to terminate a parent-child relationship:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove these allegations by clear and convincing evidence. *In re N.G.*, 51 N.E.3d 1167, 1170 (Ind. 2016).

# II. Sufficiency

On appeal, Mother argues that the evidence is insufficient to support the order terminating her parent-child relationship with Minor Child. Specifically, Mother contends that DCS failed to prove by clear and convincing evidence that the conditions that led to Minor Child's removal will not be remedied; that continuation of the parent-child relationship poses a threat to Minor Child's well-being; and that termination is in Minor Child's best interests.

### *Conditions Resulting in Removal*

First, we must consider what conditions led to Minor Child's initial and continued removal and second, whether DCS proved that there is a reasonable probability that those conditions will not be remedied. *In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010). Minor Child was initially removed from Mother's care and custody after police officers discovered Minor Child walking alone down the middle of a busy street. Once she finally answered the officers' knocks at her door, Mother then made various accusations about DCS and claimed that she did not even know that Minor Child had left the home. Concerned about Mother's mental state, the officers then relayed their report to FCM Hardin, who determined that initial removal was necessary for Minor Child's health.

Minor Child continued to be removed from Mother's care during the CHINS case because of Mother's repeated drug use, failure to participate in court-ordered services, unwillingness to accept her diagnosis, and minimal progress in the way of treatment.

[18] Upon review of the record, we find that there was ample evidence supporting the juvenile court's conclusion that the conditions resulting in removal would not be remedied. Though we do not fault Mother for merely having a mental illness, we do take into consideration whether that mental illness affects Mother's ability to parent Minor Child in a safe and appropriate way. *See R.G. v. Marion Cty. Office, Dep't of Family & Children*, 647 N.E.2d 326, 330 (Ind. Ct. App. 1995) (holding that a parent's mental illness "standing alone, is not a proper ground for terminating parental rights. However, in instances where the parents are incapable of or unwilling to fulfill their obligations in caring for their child, mental illness may be considered[] (internal citation omitted)).

[19] Here, the record is replete with evidence demonstrating Mother's lack of commitment to fulfilling her obligations during the CHINS proceedings. Any time Mother showed some indicia of progress, she regressed and directly violated the juvenile court's orders. *See, e.g., Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (holding that the juvenile court may "consider the parent's response to the services offered through . . . DCS[]" in CHINS proceedings). At every step of the way, Mother plainly denied having any mental health issues, neglected to commit to both inpatient and outpatient services, refused to return drug screens (and even when she did,

returned positive drug screens), questioned the authority and credentials of medical and DCS professionals assisting her with the reunification process, and did not follow through with any of her providers' recommendations.

[20] Furthermore, Mother failed to make any meaningful efforts to reestablish a bond with Minor Child from the moment of removal. When Minor Child lived in foster care and was geographically closer to Mother, Mother simply did not attend supervised visitations. And when Minor Child was placed with her maternal grandmother in Chicago, Mother did little to make visitations happen, even when DCS arranged for visitations to take place in Lafayette and provided Mother with a gas card. Mother's failure to exercise her right to visit her child demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship[.]" *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002).

[21] Therefore, we can only find that the evidence is sufficient to support the juvenile court's conclusion that there is a reasonable probability that the conditions resulting in Minor Child's removal will not be remedied.

### *Threat to Minor Child's Well-Being*[4]

[22] To meet this statutory element, "[c]lear and convincing evidence need not reveal that 'the continued custody of the parents is wholly inadequate for the child's very survival.'" *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005) (quoting *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233 (Ind. 1992)). "Rather, it is sufficient to show by clear and convincing evidence that 'the child's emotional and physical development are threatened' by the respondent parent's custody." *Id.* (quoting *Egly*, 592 N.E.2d at 1234).

[23] In evaluating the well-being of the child, "[juvenile] courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002). And here, Mother has a known history of using and abusing both legal and illegal substances. Mother returned drug screens where she tested positive for cocaine and amphetamines. During the CHINS proceedings, Mother gave birth to another child; but it was later revealed that Mother smoke and drank heavily during her pregnancy.

---

[4] We note that the termination statute is phrased in the disjunctive, and because we find that the element of showing that there is a reasonable probability that the conditions that led to Minor Child's removal will not be remedied has been satisfied, we are not required to address this issue. However, we choose to do so briefly.

[24]    Numerous individuals and entities—Lifesprings outpatient facility, FCMs Hardin and Campbell, Dr. McIntire, and the Centerstone facility—urged Mother to admit herself to an inpatient facility, but she consistently refused to do so. Not only that, but Mother oftentimes forgot or simply refused to take her prescription medication to treat her schizophrenia, despite receiving prescription cards from DCS and Centerstone to offset expensive drug prices. FCMs Hardin and Campbell both testified that Mother has yet to fully come to terms with her illness and how it impacts every facet of her life. According to them, this inability to care for herself would threaten Minor Child's well-being should she be returned to Mother's care and custody.

[25]    The evidence shows that despite the availability of various services designed to assist Mother with her mental health struggles, Mother has not fulfilled her obligations. And as it stands, in our opinion, Mother does not have a safe and nurturing home to which Minor Child can return. To the contrary, we believe Mother's erratic behavior, exacerbated severely by her frequent delusions and uncooperativeness, would pose a threat to Minor Child's well-being. Should Minor Child return to Mother's home, the evidence reveals that there is a high likelihood that the unstable environment therein will have a deleterious and prolonged effect on Minor Child's future.

[26]    Therefore, we find that the juvenile court did not err when it concluded that DCS proved by clear and convincing evidence that continuation of the parent-child relationship would be a threat to Minor Child's well-being.

### *Best Interests of Minor Child*

[27] "The purpose of terminating parental rights is not to punish parents but to protect their children." *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001). "[I]n determining what is in the best interests of the children, the court is required to look . . . to the totality of the evidence." *Id.* at 776. In so doing, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.*

[28] Here, the juvenile court determined that a permanency plan had been established for Minor Child to be adopted by her maternal grandmother. And after hearing testimony from FCMs Hardin and Campbell and CASA Reynolds about Mother's ongoing mental health struggles and her need for even more treatment, the juvenile court concluded that termination was in Minor Child's best interests.

[29] We concur in the juvenile court's assessment. We reiterate that it is not the mere presence of Mother's schizophrenia diagnosis that has led to termination, and we acknowledge the very real issues she has to face. Individuals with a variety of mental and physical health struggles make excellent parents, but in this case, Mother has been unable to meet that bar. Simply put, in looking at the totality of the circumstances, we find that Minor Child needs more, especially when considering how young she is. The record shows that following nearly three years of treatment options and DCS-sponsored assistance, Mother is still simply not in a position to care for her Minor Child. We urge Mother to continue with inpatient treatment and seek further help.

[30]     Minor Child needs and deserves to have a loving and stable household in which to thrive, and she has that with her maternal grandmother. With all of this in mind and given that DCS has established a solid permanency plan for Minor Child's adoption, we find that the juvenile court did not err by concluding that DCS proved by clear and convincing evidence that termination is in Minor Child's best interests.

[31]     The judgment of the juvenile court is affirmed.


Bradford, C.J., and Pyle, J., concur.