## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2018, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Matter of the Termination of the Parent-Child Relationship of M.A., N.A., W.A., W.A., (Minor Children),

and,

R.F. (Mother),

*Appellant-Respondent*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner*,
and,

April 30, 2018

Court of Appeals Case No.
49A05-1710-JT-2492

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge
The Honorable Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1607-JT-765
49D09-1607-JT-766
49D09-1607-JT-767
49D09-1607-JT-768

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem.*

**Barnes, Judge.**

## Case Summary

[1] R.F. ("Mother") appeals the termination of her parental rights to M.A., N.A., Wh.A., and We.A. ("Children"). We affirm.

## Issue

[2] Mother raises one issue, which we restate as whether the evidence is sufficient to support the termination of her parental rights.

## Facts

[3] On July 12, 2011, Mother had her parental rights terminated for six of her children. Department of Child Services ("DCS") had initiated a child in need of services ("CHINS") case after one child who, being only six weeks old, suffered non-accidental, life-threatening injuries while in Mother's care. Mother was provided services for two-and-a-half years, but she failed to make significant progress.

[4] Since the termination of Mother's parental rights for those six children, Mother has given birth to four more children, M.A., N.A., Wh.A., and We.A. Around June 16, 2015, Mother and Children were at a Meijer in Marion County. Mother was panhandling for money at the store with the children. Mother reported to police that she was being evicted from her home, and she had no plan as to what she was going to do. DCS received a report about Mother and Children stating that two of the children did not have on shoes and one did not have on a shirt. On June 17, 2015, Children were removed from Mother's care due to concerns that Mother was unable to provide for Children's needs and lacked stable housing. On June 18, 2015, DCS filed its CHINS petition alleging:

1.  [Mother] has failed to provide the children with a safe, stable, and appropriate living environment.

2.  [Mother] is currently homeless.

3.  She lacks the financial means necessary to provide the children with basic care and necessities.

4.  [Mother] was begging for money outside of a store with the children present, and she reported to the police that she had nowhere to go.

5.  [Mother] does not have a support system in place, and she has not developed a plan to obtain and maintain stable housing.

6. [Mother] has a history with DCS and was previously offered services through a CHINS action.

7. She failed to successfully complete the services to remedy the reasons for DCS's involvement, and her parental rights were terminated as to six of her children.

8. I.A. ("Father") has not demonstrated the ability and willingness to appropriately parent the children, and he is unable to ensure their safety and well-being while in the care and custody of [Mother].

9. Due to the foregoing reasons, the coercive intervention of the Court is necessary to ensure the children's safety and well-being.

Petitioner's Ex. 4 at p. 77.

In July 2015, Mother was referred to Alliance for Life for supervised visitation. On October 7, 2015, the court held a fact-finding hearing and adjudicated Children as CHINS. During a visit on October 10, 2015, Mother was irate and acting irrationally. The police had to be called because Mother did not want to leave the building. Children were crying and stated that they were afraid. Due to Mother's behavior, Alliance for Life discontinued Mother's visits. DCS requested that Mother's parenting time be suspended. On November 4, 2015, Mother's parenting time was suspended, and the court entered its dispositional decree and parental participation order ordering Mother to participate in services including home-based case management; a parenting assessment;

random drug screens; a psychological evaluation; a medication management evaluation; individual therapy; and follow all recommendations. The court authorized Mother's parenting time to resume upon her participation in services.

[6] Mother completed a psychological evaluation which diagnosed her with post-traumatic stress disorder ("PTSD") and schizophrenia. Based on her psychological evaluation, Mother was referred to Cummins Behavioral Health. On November 5, 2015, Mother completed an intake assessment at Cummins Behavioral Health. Based on the assessment, Mother was recommended to participate in medication management, case management, life skills, and home-based therapy. Mother attended about three sessions before her services at Cummins Behavioral Health were closed, on January 14, 2016, in order to transfer Mother to a community mental health agency. Mother began mental health services at Gallahue.

[7] In April 2016, Mother's supervised visits with Children resumed because she had started participating in mental health services at Gallahue. In June 2016, Mother's visitation was suspended again due to behaviors that she displayed during a visit. In order for Mother's visits to resume, Mother had to demonstrate she was participating in ongoing mental health treatment and obtain recommendations from her providers that visits should resume. On June 15, 2016, the court changed Children's permanency plan from reunification to adoption due to Mother repeatedly indicating that she would not follow recommendations regarding medication to assist her in managing her mental

health; exhibiting erratic behaviors around the children and providers; lacking stable housing; lacking stable employment income; and Father's noninvolvement with the children since the CHINS action was filed. In fact, Father's parental rights were previously terminated.

[8] During the first year of treatment at Gallahue, Mother did not make any improvements. In March 2017, Mother began taking her medication consistently and making improvements. However, Mother continued to demonstrate "ongoing paranoid thoughts." Tr. p. 189. In May 2017, Mother was referred to home-based therapy. The therapist had been meeting with Mother twice a week and helping her with decreasing anxiety and processing trauma. At the time of the termination hearing, Mother's home-based therapist was not recommending that Mother resume visitation with Children because Mother seamed unstable. The therapist testified that she would have concerns if Children were placed back into Mother's care at that point in time because Mother was not mentally stable and she was unsure about whether Mother would be able to effectively and safely parent Children. Mother's visits never resumed.

[9] In June 2015, Wh.A. and We.A. were placed in their current foster home. N.A. and M.A. were placed together in a different foster home, but they were later moved to their current home where Wh.A. and We.A. are placed. Children appear to have bonded with their foster parents and do not ask about Mother. The foster parents ensure that Children's medical, educational, emotional, and mental health needs are being met, and they are willing to adopt

Children. At the time of the termination hearing, Mother had recently moved out of a cluster apartment with Gallahue staff and was living with her sister. Mother was unemployed, and it was unclear whether the living arrangement with her sister was temporary or permanent. On October 5, 2017, the court entered an order terminating Mother's parental rights. Mother now appeals.

## Analysis

[10] Mother challenges the termination of her parental rights to Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[11] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and

reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights, as required by Indiana Code Section 31-35-2-8. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[12] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

## I. Trial Court's Findings

[13] Mother argues that several of the trial court's findings are clearly erroneous. She first challenges Finding No. 24, which states: "Home-Based Case Management has been referred at least three times. Mother has not successfully completed it." Appellant's App. Vol. II p. 46. Mother is correct that the evidence indicates that home-based case management has been referred to her twice, not at least three times. However, the evidence does support the trial court's conclusion that Mother failed to successfully complete it. We conclude that the trial court's minor error is harmless and does not impact its ultimate decision here.

[14]    Next, Mother challenges Finding No. 26, which provides: "The DCS [Family Case Manager] ("FCM") referred Mother to individual counseling. However, she did not complete this service and it was closed unsuccessfully." *Id.* The evidence indicates that the FCM referred Mother to individual counseling once and that the referral was not successfully completed. The record supports the trial court's finding, and it is not clearly erroneous.

[15]    Mother also challenges Finding No. 28, which states: "Robin Robinson has been providing Home Based Therapy to Mother since March 2017. Ms. Robinson has noted some progress. However, Ms. Robinson is concerned that Mother continues to deny that she has issues. As of two weeks before this Termination Trial began, Ms. Robinson was not in agreement with Mother receiving parenting time." *Id.* The record indicates that Ms. Robinson initially believed that she had been providing home-based therapy to Mother since March 2017 but later corrected herself by stating that she had been providing home-based therapy to Mother since May 2017. The evidence also indicates that, as of two weeks before the termination trial, Ms. Robinson was not in agreement with Mother receiving parenting time. We conclude that the trial court's minor error is harmless and does not impact its ultimate decision here.

[16]    Finally, Mother challenges Finding No. 41, which provides: "Since the beginning of the CHINS case, over two years ago, Mother has not demonstrated that she is capable of providing the children of a safe and stable home, as demonstrated by her behavior during visits with the children." *Id.* at 47. The record indicates that throughout the pendency of this case, Mother has

made very little progress with addressing her issues and continues to harbor paranoid thoughts. Mother also has had her supervised visits with Children terminated (twice) due to her erratic and irrational behavior during visits. Mother's therapist testified that she was unsure about whether Mother would be able to effectively and safely parent Children. Furthermore, the record indicates that, at the time that Children were placed in foster care, Mother reported that she was being evicted from her home and that she had no plan as to what she was going to do. Within a few months, Mother was living in a cluster apartment with Gallahue staff. A little over one year later, Mother began living with her sister. It was unclear whether Mother's living arrangement with her sister was temporary or permanent. This evidence does not demonstrate that Mother is capable of providing the children with a safe and stable home. The record supports the trial court's finding, and it is not clearly erroneous.

## II. Changed Conditions

[17] Mother challenges the trial court's finding of a reasonable probability that the conditions resulting in Children's removal or the reasons for placement outside their home will not be remedied.[1] In order to prove this element, DCS must

---

[1] Mother also argues that the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the well-being of Children is clearly erroneous. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Subsection (b)(2)(B)(iii), which concerns repeated CHINS adjudications, is inapplicable here. Consequently, DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in Children's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of Children. The trial court found a reasonable probability that the conditions that resulted in Children's removal and continued placement outside parents' home would not be remedied, and there is sufficient evidence in the record to support the trial court's conclusion. Thus, we

establish (1) what conditions led to DCS placing and retaining the children in foster care; and (2) whether there is a reasonable probability that those conditions will not be remedied. *In re I.A.*, 934 N.E.2d at 1134. When analyzing this issue, courts may consider not only the basis for the initial removal of the children, but also reasons for the continued placement of the children outside the home thereafter. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Courts must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed circumstances. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child. *Id.* Factors to consider include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Courts also may consider services offered to the parent by DCS and the parent's responses to those services. *Id.* DCS is not required to prove a parent has no possibility of changing; it need only establish a reasonable probability that no change will occur. *Id.*

[18]     On this issue, the trial court concluded:

---

need not determine whether there was a reasonable probability that the continuation of the parent-child relationship poses a threat to Children's well-being. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*.

There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside of the home will not be remedied by their mother. Mother has had nearly two years to complete services and has not done so. She has not demonstrated that she has the appropriate skills to parent her children. She has not demonstrated that she has the requisite skills to cope with domestic violence. Based on the observations of multiple service providers, Mother is unable to safely parent her children. As recently as May 19, 2017, during a session with Recovery Clinical Leanne Bennett from Gallahue, Mother still demonstrated overall paranoid thoughts. Ms. Bennett noted that Mother "continues to believe others are trying to trick her or hurt her. Believes her latest 4 children were taken by the police for no reason, that it was some sort of plot against her." In a number of reports, and as recently as June 19, 2017, Ms. Bennett concludes that Mother's "insight and judgment is poor to fair[.]" On May 26, 2017, Ms. Bennett noted that Mother's ". . . judgment is poor when understanding her years of involvement with DCS. As recently as July 7, 2017, Nurse Practitioner Beth Delambo reported that Mother had "ongoing paranoid thoughts, though with decreased severity."

Appellant's App. Vol. II p. 47.

[19] On appeal, Mother argues that she has made a significant amount of progress and the conditions that resulted in Children's removal and continued placement outside of the home will be remedied by her. DCS presented evidence of the conditions that led to DCS placing and retaining the children in foster care. On June 17, 2015, Children were removed from Mother's care due to concerns that she was unable to provide for their needs and lacked stable housing. Children were adjudicated as CHINS and the trial court ordered Mother to complete home-based case management, a parenting assessment, random drug screens, a psychological evaluation, individual therapy, and a medical management evaluation. Children remained in foster care because Mother was making very

little progress with addressing her issues, despite the services offered and continued to demonstrate ongoing paranoid thoughts. Mother's behavior also continued to be erratic around the children.

[20] DCS also presented evidence that there is a reasonable probability that those conditions will not be remedied. At the time of the termination hearing, Mother was unemployed, and it was unclear whether her living arrangement with her sister was temporary or permanent. Mother was also mentally unstable and thus unable to continue visitation with Children. In fact, at the time of the termination hearing, Mother's therapist testified that she would have concerns if Children were placed back into Mother's care at that time because Mother was not mentally stable and that she was unsure about whether Mother would be able to effectively and safely parent Children.

[21] Mother contends that DCS failed to comply with the Americans with Disabilities Act ("ADA") because DCS failed to consider Mother's mental health record prior to refusing requests for parenting and terminating her parental rights, and that DCS failed to provide Mother with the services necessary to assist with her disability. In accordance with the ADA, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132. When Children were placed in foster care, Mother was provided with a psychological evaluation which diagnosed her with PTSD and schizophrenia. Mother was then referred to Cummins

Behavioral Health to receive help with her PTSD and schizophrenia. Mother attended about three sessions before her services were closed in order to transfer her to a community mental health agency. While at the community mental health agency, Mother failed to make very much progress and continued to act erratic during visits with Children, resulting in her loss of visitation with Children and part of the reason for the termination of her parental rights. DCS did not fail to consider Mother's mental health record or fail to provide Mother with the services that were necessary to assist with her disability and the opportunity to get her children back, and thus did comply with the ADA.

[22] It is well-settled that a parent's mental illness or disability cannot, standing alone, support the termination of parental rights. *See In re V.A.*, 51 N.E.3d 1140, 1147 (Ind. 2016). However, if such illness or disability causes a parent to be unable and unwilling to develop the skills necessary to fulfill his or her legal obligations as a parent, parental rights may be terminated. *Id.* at 1148 (citing *R.G. v. Marion County Office of Family & Children*, 647 N.E.2d 326, 330 (Ind. Ct. App. 1995), *trans. denied*). Here, Mother's instability still existed at the time of the termination hearing and it would have posed a danger to the welfare of the children if they were to be returned to her care.

[23] Given Mother's lack of progress, unemployment, and unstable housing at the time of the termination hearing, despite services offered, the trial court's finding of a reasonable probability that the conditions resulting in Children's removal or the reasons for placement outside their home will not be remedied is not clearly erroneous.

### III.    Best Interests

[24]    Mother also challenges the trial court's finding that termination of her parental rights is in Children's best interest.  In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence.  *D.D.*, 804 N.E.2d at 267.  In doing so, the trial court must subordinate the interests of the parents to those of the child involved.  *Id.*

[25]    Mother concedes that Children need permanency in a stable environment where their needs would be met and argues that she has demonstrated that she can provide permanency and a stable environment.  Throughout the pendency of this case, Mother has made very little progress with addressing her issues and continues to harbor ongoing paranoid thoughts.  Mother has had her supervised visits with Children terminated twice due to her erratic and irrational behavior during visits.  At the termination hearing, Mother's home-based therapist testified that she would have concerns if Children were placed back into Mother's care because Mother was not mentally stable and that she was unsure about whether Mother would be able to effectively and safely parent Children.

[26]    At the time of the termination hearing, Mother was unemployed, and it was unclear whether her living arrangement with her sister was temporary or permanent.  For approximately two years, Children have been living together in a foster home with foster parents they appear to have bonded with and do not ask about Mother.  The foster parents ensure that Children's medical, educational, emotional, and mental health needs are being met, and they are

willing to adopt Children. The FCM recommended the termination of Mother's parental rights. The court appointed special advocate ("CASA") opined that it was in Children's best interests for Mother's parental rights to be terminated and for Children to remain in their current foster home and to be adopted by that family.

[27] Mother has failed to demonstrate that she can provide permanency and a stable environment for Children. Termination of Mother's parental rights will allow Children to be adopted into a stable and permanent home where their needs will be safely met. We cannot say that the trial court's finding is clearly erroneous.

## Conclusion

[28] The evidence is sufficient to support the termination of Mother's parental rights to Children. We affirm.

[29] Affirmed.

Vaidik, C.J., and Pyle, J., concur.